the conviction and sentence are set aside, and it is ordered that the defendant be discharged.

**20 So.2d 546**

**STATE v. GETTY (two cases).**

**No. 37346.**

Dec. 11, 1944.

John B. Smullin, Chief Counsel, of Baton Rouge, for plaintiff and appellant.

Wallace H. Adams, of Jennings, and Thomas F. Porter, of Lake Charles, for defendants-appellees.

ODOM, Justice.

Judge Hood wrote an opinion in this case which is copied in the record. It seems to be conceded by counsel for both sides that his statement of the facts and the issues involved is correct. The judge held that under the facts disclosed at the trial the State could not recover and dismissed its suit. The State appealed.

Counsel for the State argued orally before the court and in his brief that the judge erred in his interpretation of the statute involved. We cannot agree with counsel. Our opinion is that Judge Hood's interpretation of the statute is correct. He has correctly disposed of all the points raised. We here copy his opinion in full and adopt it as our own:

### Opinion of Judge Hood.

"These two cases have been consolidated for the purpose of trial. The facts in the two cases are identical and are practically undisputed, and the issues presented in both cases are the same.

"The suits were instituted by the State Department of Revenue against these defendants for the collection of the Power Tax on certain described machinery and apparatus alleged to be due under Act 25 of the Second Extra Session of 1935 as amended by Act 5 of the Fourth Extra Session of 1935, known as the Power Tax Law.

"The facts in the two cases are substantially as follows: The defendants, insofar as these suits are concerned, are engaged in the business of producing oil from shallow oil wells in the Jennings Oil Field.

"It appears that the defendants, taken together, own and operate six wells, three being owned and operated by one of the defendants, and three by the other defendant. All these wells have to be pumped to produce oil, and the pumps used for this purpose are all operated by electric power purchased from an electric Power Company and on which the power tax is all paid and no controversy exists as to the power tax on the main electric power unit which furnished the power for pumping the wells.

"It appears, however, that these defendants have at each of these six wells a small steam engine; that is to say, one of these steam engines is stationed at each of the three wells owned and operated by the defendant, Mr. Getty, and one of the steam engines is stationed at each of the three wells owned and operated by the defend-

ant, Mrs. Getty. There is, however, only one boiler used for generating steam to operate all six of these engines, and it is so located that all of these engines are connected with and may be operated from the one boiler. The boiler, however, is capable of generating steam sufficient to operate only two of these engines at the same time, and the evidence shows that, as a matter of fact, only one of these engines is ever operated at a time.

"The record further shows that these steam engines so stationed at these wells, as likewise the boiler, are never used for pumping the wells, all of the wells being pumped as above stated by electric power from the main electric power unit. These steam engines, according to the record, are used for the sole purpose of pulling the pipe in a well when stuck or when leaky, to pull the pumps in the wells when they need repairs, to pull sucker rods when worn or broken and have to be replaced, or when some other breakdown or trouble occurs or something goes wrong with a well.

"The record shows that occasions arise for the use of these engines at very infrequent, irregular and indeterminate intervals, and for a comparatively short while when they are used. For example, the evidence shows that during the year 1942 one of these engines was not used at all and that the other five were used on an average of two or three times per year and when an engine was used it was in use for only thirty minutes to a day and a half.

"Under this statement of facts the issue presented to this Court is whether or not this boiler and/or these steam engines stationed at these wells and used for the purposes above stated are taxable under the Power Tax Statute above mentioned.

"Section 3 of Act 25 of the Second Extra Session of 1935 as amended by Act 5 of the Fourth Extra Session of 1935, under which this tax is sought to be imposed, reads as follows:

"'In addition to all other taxes of every kind imposed by law, every person * * * engaged * * * in any business or occupation, which person * * * uses in the conduct of such business or occupation at any time, electrical or mechanical power or [of] more than ten horsepower * * * shall be subject to the payment of an excise, license or privilege tax of fifty cents (50¢) per annum for each horsepower capacity of the machinery or apparatus, known as the 'prime mover' or 'prime movers,' operated by such person * * * for the purpose of producing power for use in the conduct of such business or occupation * * * provided, that the tax imposed by this Section shall not apply to machinery and apparatus used for stand-by or emergency purposes.'

"It will be noted that the Statute imposes the tax only on 'machinery or apparatus, known as "prime mover" or "prime movers,"' and then expressly provides that the tax shall not apply to 'machinery and apparatus used for stand-by or emergency purposes.'

"It is contended by the State, as this Court understands, that the steam engines in this case sought to be taxed are not

used for 'stand-by' or 'emergency' purposes within the contemplation of the Statute, but are 'prime movers' within the contemplation of the Statute and are thus taxable. In support of this position it is urged that a stand-by machine as contemplated in this Statute is one that is used to take the place of the main power unit in the normal operation of the business, when the regular power unit is for any reason out of commission, and that no such situation exists with respect to the steam engines in this case, since they are never used to take the place of the main electric power unit for pumping the wells.

"It is further urged that these engines are not used for 'emergency' purposes within the contemplation of the Statute for the reason that the break-downs and repairs which occasion the use of these engines are such as may be reasonably expected or looked for at any time during the normal operation of the business, and hence the purposes for which they are used do not come within that class of 'emergency purposes' contemplated by the Statute, but are properly classed as 'prime movers' in the normal conduct of this business.

"The answer of the defendants is in the nature of a general denial. They contend that these engines are not used by them as 'prime movers' in the conduct of this business, but that they are used solely for 'stand-by or emergency purposes' within the contemplation of the Statute, and hence are not taxable.

"In order to determine the issue thus presented this Court is, therefore, called upon to construe the term 'stand-by or emer-

gency purposes' as used in the Statute and as applicable to the facts in the case before us.

"Bouvier's Law Dictionary defines 'emergency' as follows:

" 'An unexpected condition demanding immediate action' and then gives as synonyms: 'crisis, conjuncture, exigency, pinch, strait, necessity.'

"Words and Phrases has this to say on the meaning of the term 'emergency.'

" 'Webster defines the word "emergency" as "any event or occasional combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency." ' [14 Words and Phrases, Perm.Ed., p. 299.]

"Corpus Juris, vol. 20, page 499, defines 'emergency' as follows:

" 'Any event or occasional combination of circumstances which calls for immediate action or remedy; a sudden or unexpected happening; any case of casualty or unavoidable accident.' [See, also, 29 C.J.S., Emergency, p. 760.]

"Our Courts in a number of instances have construed the term 'emergency' under a particular statement of facts, but so far as this Court has been able to determine our Appellate Courts have never been called on to construe the terms 'emergency' or 'stand-by' as used and applied in this particular Statute.

■ "This Court, therefore, in reaching its conclusions must depend very largely on its own analysis of this Statute in its contextual setting and as related to the factual

situation here presented, the Court being aided in its consideration by the very helpful briefs submitted by counsel.

"This Court, after a careful study of this Statute and its contextual setting and after a study of the very able and exhaustive briefs filed by counsel both for the State and for the defendant, is frank to say, that it can not bring itself to the views of counsel for the State in his contentions as to 'Stand-by' machinery as contemplated by the Statute and as applied to the facts as disclosed in this case.

"It may be true that a 'stand-by' machine as used in the Statute applies to any machine or apparatus furnishing mechanical power which may be or which is used to take the place of the main power unit and which does the work of the main power unit in the normal conduct of the business when the main or regular power unit is for any reason out of commission, but to say that a 'stand-by' machine as used in this Statute is limited to such a construction and application of the terms is, in the opinion of this Court, placing a construction on the term that is entirely too narrow. In the opinion of this Court, the term 'stand-by' as used in this Statute includes any machine or apparatus furnishing mechanical power and which is used only on occasions of sudden or unexpected breakdown or unavoidable accident, whether it be to replace and do the work of the main power unit in case of a breakdown there, or to furnish power when needed for repair work or replacement when an unexpected breakdown occurs anywhere else in the normal conduct of the business.

"These engines, it is true, are never used to pump or operate these wells when a breakdown occurs in the main power unit, but are used only when some trouble or breakdown occurs in the pipe, the sucker rods or pumps in the wells, and when it becomes necessary because of such breakdown or trouble to pull the pipe, the sucker rods or pumps for replacement or repairs.

"These occasions, as the record shows, are infrequent, irregular and indeterminate. This Court can see no just reason for construing this term, therefore, as used in the Statute so as to limit the application of this term to a machine furnishing mechanical power and used only to take the place of the main electric power unit for pumping these wells when the main electric power unit is out of commission.

"Nor can this Court concur in the contention of counsel for the State that these steam engines so used to furnish power for pulling the pipe, the sucker rods or the pumps for replacement or repair in cases of sudden or unexpected trouble or breakdown, are not used for 'emergency' purposes within the contemplation of the Statute, for the reason, as he contends, the purposes for which these engines are used are such as are usual, common and to be reasonably expected in the normal conduct of this business, and hence these engines are merely 'prime movers' in the normal conduct of the business of producing oil and are not used for such 'emergency' purposes as are contemplated in the Statute. This reasoning, in the opinion of this Court, is unsound for obvious reasons. The fact that casualties, unavoidable ac-

·cidents and breakdowns occur and may be reasonably expected somewhere and at some time in the normal conduct of any business clearly does not mean that such ·casualties, accidents and breakdowns do not create and constitute emergencies wherever they may occur. In the normal conduct of almost any business, for example, fires may be reasonably expected to occur at some time, and hence most concerns maintain fire insurance as a protection against loss by fire, and in many cases the larger concerns maintain stand-by fire engines and fire equipment to extinguish fires when they ·occur, but these facts do not argue with force that such fires do not create and con-stitute 'emergencies', nor does it argue with any force that the use of such stand-by fire engines and equipment in such cases of fire would not be for 'emergency' purposes. In the economy of nations, Wars may be reasonably expected to come, and hence nations create and maintain standing armies, etc. but no one would contend that such conflicts between nations do not create and constitute great national emergencies.

"In like manner, this Court can see no just reason why these engines so stationed ·at these wells and which furnish mechanical power for pulling pipe, sucker rods and pumps for repairs or replacement, etc. when necessary and which are essential elements in the conduct of this business, ·are not used for 'emergency purposes,' in the same sense as a machine furnishing mechanical power and used for replacing the main electric power unit when that main electric power unit is out of commission, would be used for an 'emergency purpose.'

"It may be said further that under our jurisprudence there is a well defined rule that a harsh or unjust construction of a statute wherever possible, should be avoided, and that a Court should avoid strained or forced constructions of a statute such as would make its application harsh and oppressive or unreasonable. With this rule in mind, and keeping in mind the factual situation in this case, that these engines are old and are not used over twice a year and then for periods of less than a day, and are never used for pumping these wells but only when at infrequent intervals it becomes necessary to pull up worn out pipe, broken sucker rods or pumps when they need repair or replacement; and keeping in mind, too, that the Statute imposes this tax only on machinery or apparatus known as 'prime movers' operated 'for the purpose of producing power for use in the conduct of such business or occupation'; and keeping in mind further that the Statute expressly provides that this tax 'shall not apply to machinery or apparatus used for stand-by or emergency purposes;' under these conditions in the opinion of this Court to construe this Statute so as to make this tax applicable to these engines to the same extent and in the same manner as the tax is applicable to the main electric power unit which is used constantly for pumping these wells, would be a harsh and unreasonable construction of the Statute.

"This Court, therefore, is clearly of the opinion, that the steam engines and/or boiler in this case upon which the power tax is sought to be imposed is not subject to this tax (1) for the reason that these

engines are not 'prime movers' used in the conduct of the defendants' business within the contemplation of this Statute, and (2) for the reason that they come within the provision of the cited Power Tax Statute which expressly provides 'that the tax imposed by this section shall not apply to machinery and apparatus used for stand-by or emergency purposes.'

"There were a few instances during the course of the trial of this case when certain objections were made to the introduction of certain evidence, and as to which objections this Court reserved its ruling, but in view of the conclusions reached herein on the main undisputed facts in the case, these objections are relatively unimportant.

"For the reasons, therefore, herein assigned, the rules herein issued are recalled and dismissed, and the plaintiff's demands are rejected."

The judgment appealed from is affirmed.